IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| CARMEN V. CIOTTI, | : | Case No. 09-11786-TPA |
| *Debtor* | : | Chapter 7 |
| | : | |
| JOHN C. MELARANGO, | : | Adversary No. 09-1152-TPA |
| TRUSTEE AND BOUBACAR | : | Document No. 15 |
| BARRY, | : | |
| *Plaintiffs* | : | |
| v. | : | |
| | : | |
| CARMEN V. CIOTTI | : | |
| *Defendant* | : | |

*Appearances:*  John C. Melarango, Esq., for the Chapter 7 Trustee
Jay R. Stranahan, Esq., for The Debtor
Boubacar Barry, Plaintiff Pro Se

## MEMORANDUM OPINION

On September 20, 2009, the Debtor, Carmen V. Ciotti, filed a voluntary Petition under Chapter 7 of the *Bankruptcy Code*. Currently before the Court is an ***Amended Complaint to Determine the Dischargeability of a Debt*** ("Complaint") filed by Plaintiffs, John C. Melarango, Trustee ("Trustee") and Boubacar Barry ("Barry"). While the pleadings are somewhat confusing as to the nature of the relief being sought, all Parties agree that this is an action in which the Plaintiffs seek to deny the Debtor a discharge under *11 U.S.C. §727 (a)(2)(A) and §727 (a)(4)(A).*[1]

---

[1] The Court's jurisdiction under *28 U.S.C. §§157 and 1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. §157(b)(2)(J)*. This *Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052.*

1

On November 29, 2010, trial on the *Complaint* commenced but was suspended after the Debtor invoked his *Fifth Amendment* right against self-incrimination on a blanket basis to nearly all questions. After issuance of a *Memorandum Order* dated January 18, 2011, ruling on the continued exercise of the Debtor's invocation of his *Fifth Amendment* privilege, trial reconvened and concluded on February 8, 2011. The Debtor was recalled as a witness and testified, answering each question without *Fifth Amendment* assertion. The Parties have filed post-trial briefs and the matter is now ready for decision. For the reasons stated herein, the Court finds that the Plaintiffs have failed to meet their burden of proving the elements of *Section 727(a)(2)(A)* and *Section 727(a)(4)(A)* and therefore, the *Complaint* must be dismissed.

## *FINDINGS OF FACT*

The Debtor and his wife filed a prior Chapter 7 case on May 10, 2000, at Case Number 00-10818. It was a simple, no asset case. The Debtor and his wife received a discharge and the case was closed on September 28, 2000.[2]

On April 9, 2009, Barry obtained a default judgment from the Magisterial District Court against the Debtor. On July 2, 2009, the judgment was entered in the Erie County Court of Common Pleas. On that same date, Barry executed a Praecipe for a Writ of Execution (the "Writ") in hopes of collecting on his judgment. The Writ describes the property subject to execution as a "White Dodge Truck, License # YXC - 4323." The Erie County Sheriff attempted to execute on the

---

[2] The same attorney who represented the Debtor and his wife in the prior bankruptcy also filed the present case on behalf of the Debtor. After the present case was filed the attorney was elected to the position of a judge in the Court of Common Pleas of Erie County, Pennsylvania and his involvement in this case was terminated on June 18, 2010. Current counsel, from the same law firm, has represented the Debtor in this Adversary Proceeding.

Writ, but the effort was unsuccessful because the Sheriff's Department was unable to locate the Debtor. The Writ was never served on the Debtor and he was not aware of its existence prior to the filing of this bankruptcy case. Although other creditors held judgments against the Debtor, unlike Barry, none of them actively pursued collection.

At the time the Writ was issued, the Debtor did own a 1998 Dodge Ram truck as described in the Writ. The truck was in poor condition and barely operable. On July 29, 2009, the Debtor drove the truck to the City Auction House in West Springfield, Pennsylvania, stopping several times along the way to fill the radiator with water. It was sold that same day at auction for $1,250. The Debtor then transferred the proceeds from the sale to his wife, from whom he was separated at the time, to assist in the support of their children and her.

As suggested above, the Debtor's financial fortunes did not improve after his first bankruptcy case. At the time of filing of the present case in September 2009, the Debtor listed on Schedule I that he only had temporary employment for two months as a carpenter. On his Statement of Financial Affairs, the Debtor stated at Question No. 1, that in 2007 and 2008 he was a self-employed "remodeler" earning income of $11,011 and $18,071, respectively. Schedules A and B reveal that at the time of filing, the Debtor owned only modest assets consisting of his residence at 534 West 16th Street, Erie, Pennsylvania valued at $20,000, which the Debtor inherited from his mother, and personal property consisting of household goods and wearing apparel, with a total value of $450. The Debtor's focus and the reason for the filing of the present case was to protect the 534 West 16th Street property in which he has resided at all times relevant to this case.

The Debtor listed no secured obligations and claimed all of his property as exempt.[3] The Debtor also listed creditors holding unsecured nonpriority claims in the amount of $194,368, many of which he identified as "trade debt," and including certain creditors, among them, Barry, who had obtained judgments against him prior to his filing.

On November 4, 2009, the First Meeting of Creditors pursuant to *11 U.S.C. §341* was held.  The Debtor was placed under oath and questioned by the Trustee and by Barry, *inter alia*, about the accuracy of his bankruptcy schedules and the transfer of the truck.  The transcript of the §341 Meeting reflects some confusion and misunderstanding by the Debtor as to the meaning of "transfer" and the meaning of "property" in the context in which they were used.  The Debtor initially answered "no" to the question of whether "[i]n the past five years prior to your bankruptcy filing, did you give away or transfer any of your property to anyone else?"  However, upon further questioning by the Trustee concerning the truck the Debtor testified as follows:

> Q.  Do you have a vehicle?
> A.  No
> Q.  What happened to your truck?
> A.  It broke down. (Inaudible.)
> Q.  I'm sorry?
> A.  It wasn't running.  I got rid of it.
> Q.  When?
> A.  Oh, about six months ago (inaudible). It wasn't running.
> Q.  Well, previously I asked you if you transferred any of your property, and you said no.  So now you're telling me, yes, you did?
> Debtor Atty.:  You didn't actually transfer it to anybody, did you?

---

[3] The Debtor listed obligations owed to Erie County Tax Claim Bureau and Erie Water Works as unsecured priority claims.  In reality, these creditors likely hold secured claims against the Debtor's residence.  Similarly, the judgment filed in the Court of Common Pleas of Erie County, PA, by Plaintiff Barry on July 2, 2009, and, previously referred to in this *Opinion*, would also appear to be a secured claim /lien against the Debtor's real estate.

      A.        No, no.
      Q.        Where's the truck?
      A.        That, I don't really know. I sold it at an auction.

*See Ex. F, Tr. of 11/4/2009 Section 341 Meeting of Creditors* at 9-10. The Debtor further testified that he had no knowledge that the Writ had been issued or that there was a levy against the truck at the time it was sold.

As noted, Barry also questioned the Debtor. In response, the Debtor testified that although he had knowledge of the existence of Barry's judgment, he had no knowledge of the Writ or that anyone was looking for the truck. At the conclusion of his questions at the §341 Meeting, the Trustee indicated to Debtor's Counsel that he was required to amend the schedules and the Statement of Financial Affairs to clarify circumstances surrounding the disposition of the truck and to correct certain other information.

Following the §341 Meeting, on November 23, 2009, Debtor's Counsel filed the requested amendments. In the Amended Statement of Financial Affairs, Counsel erred in describing the circumstances involving the sale of the truck, erroneously listing a "1997 Ford Exconoline" (sic) as the vehicle sold at the Butler Auto Auction on July 2, 2009 for $1,200. Actually, the "Exconoline" was another vehicle owned by the Debtor that was repossessed by another creditor, without objection, pursuant to an order dated November 10, 2009, granting a motion for relief from stay. A Second Amended Financial Disclosure Statement was then filed on December 18, 2009, this one correctly stating that a 1998 Dodge Ram was sold at City Auction House on July 29, 2009, for $1,250 and providing a copy of the receipt from the auction company evidencing the sale of the vehicle.

5

On December 31, 2009, Barry, acting *pro se*, filed an initial Complaint which commenced the within Adversary Proceeding. Barry also filed with the Court a copy of a letter dated December 30th he sent to the Trustee questioning whether the Debtor would be granted a discharge. As directed by the Court, the Trustee filed a Status Report in response to Barry's letter averring that the Trustee had spoken with Barry on numerous occasions, advising him of his right to pursue an objection to the Debtor's discharge and that he should obtain independent legal counsel since the Trustee did not plan to pursue any such claim. Consistent with that approach, on January 14, 2010, the Trustee filed a Report of No Distribution.[4] At the initial hearing on Barry's Complaint, the Court directed the Trustee to further investigate the allegations by Barry, and if warranted, directed the Trustee to file an amended complaint which ultimately resulted in the filing of the *Complaint* presently before the Court.

During discovery in the adversary, the Trustee deposed the Debtor. Consistent with his testimony at the §341 Meeting, the Debtor again testified that: (1) his residence was 534 West 16th Street, Erie, PA; (2) he thought "property" meant only "real property" not personal property as well; (3) he believed that "transfer" of property meant that property was transferred without receiving value in return; (4) the Dodge Truck was sold at auction on July 29, 2009; (5) the proceeds were transferred to his estranged spouse for support and he was not aware of the existence of the Writ at the time the truck was sold. The Debtor also testified that the Amended Statement of Financial Affairs which listed an "Exconoline" Truck was an error by his attorney not him.

---

[4] On December 1, 2009, the Trustee had filed a *Report of No Distribution* which was withdrawn on December 4, 2009.

6

On February 9, 2011, at trial, the Debtor testified before the Court. The Court was able to observe his demeanor and found his testimony to be generally credible.[5] The Debtor again stated that: (1) his residence is and has at all relevant times been 534 West 16th Street, Erie; (2) he filed a prior bankruptcy case in 2000; (3) he owns a house and owned a truck which was sold before the present bankruptcy filing; (4) numerous judgments had been entered against him prior to his sale of the truck; (5) when he indicated on his Schedules that he had made no other "transfers" of property, he thought his statement was accurate because he thought "property" meant real estate; (6) upon the sale of the truck, the proceeds were tendered to his wife for support; (7) when he indicated at his deposition that he had not met with his attorney prior to his deposition, he did so because he thought meetings with his attorney were confidential; (8) the first amendment to his schedules which listed the "Exconoline" truck as the vehicle "sold" was an error of counsel whom he relied upon; (9) he did not know of the existence of, or even the issuance of, the Writ prior to the sale of his truck; and, (10) although he knew there were numerous judgments against him, he had been subjected to prior judgments over the years but never lost any property as a result of an effort to satisfy a judgment.

## *DISCUSSION*

A discharge under *11 U.S.C. §727* is the "heart" of the fresh start provided a debtor

---

[5]  As the finder of fact, the Court must assess the veracity of witnesses. The importance of first-hand observation of the testimony of a witness is recognized by *Fed.R.Bankr.P. 8013* which provides that findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Here, the Debtor appeared genuine, honest and believable in testifying before the Court. His testimony concerning his lack of understanding of the terminology used in the various questions previously posed to him in the context presented, was convincing.

under bankruptcy law. *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993). Denial of a discharge should occur only in extreme circumstances. *In re Corona*, 2010 WL 1382122 at *7 (D. N.J. 2010) citing *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995); *In re Yanni*, 354 B.R. 708, 711 (Bankr. E.D. Pa. 2006). As a result, courts are to liberally construe the discharge provisions of the *Bankruptcy Code* in favor of the debtor. *Rosen* at 1531.

A discharge in bankruptcy, however, is meant to discharge only the honest but unfortunate debtor. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). In considering an objection to discharge, Plaintiffs maintain the burden of proof and must prove their case by a preponderance of the evidence. *Id*. at 290-91; *In re Georges*, 138 Fed. Appx. 471, 472 (3d Cir. 2005); *Cadle Co. v. Zofko*, 380 B.R. 375, 382 (W.D. Pa. 2007).

### *Section 727(a)(2)(A)*

*Section 727(a)(2)(A)* provides that a discharge will not be granted where:

> [t]he debtor, with intent to hinder, delay, or defraud a creditor...has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, property of the debtor, within one year before the date of the filing of the petition.

*11 U.S.C. § 727(a)(2)(A)*. To prevail on a cause of action under *Section 727(a)(2)(A)*, the Plaintiffs must show (1) a disposition of property, such as a transfer or concealment; (2) a subjective intent on the debtor's part to hinder, delay, or defraud one or more creditors or the bankruptcy trustee through the disposition; and, (3) that both the disposition and subjective intent occurred within one year before the petition date. *Corona* at *13 *citing Rosen,* 996 F.2d at 1531. A denial of discharge

8

under *Section 727(a)(2)(A)* thus requires both an act, such as a transfer of the debtor's property, and an improper motive, such as actual intent to hinder, delay, or defraud creditors. *Corona* at *13; *In re Hoza*, 373 B.R. 409, 413 (Bankr. W.D. Pa. 2007). Unlike the fraudulent transfer provisions of the *Bankruptcy Code*, there is no concept of a "constructive" fraudulent transfer here. An actual intent to hinder, delay or defraud must be shown. *Compare 11 U.S.C. §727(a)(2)(A)* and *11 U.S.C. §548(a)(1)*. *In re Rose*, 425 B.R. 145 (Bankr. M.D. Pa. 2010). Because a debtor is unlikely to admit directly that his or her actions were motivated by fraud, intent may be inferred through the use of circumstantial evidence or inferences drawn from a course of conduct by the debtor. *Id.*

Here, Plaintiffs assert that the Debtor is not entitled to a discharge under *Section 727(a)(2)(A)* "as he transferred the 1998 White Dodge Truck with actual intent to hinder, delay, or defraud creditors."[6] The Debtor does not deny the fact of the transfer or that it occurred within one year of the petition date. The only matter at issue is whether the transfer was made with the intent to hinder, delay or defraud Barry or other creditors.

The Debtor knew that Barry, as well as several others, had obtained judgments against him prior to the sale of the truck. Judgments had been entered against the Debtor in the past, but he had never suffered a loss of property in a creditor's attempt to satisfy a judgment. The Writ was never served on the Debtor and there was no evidence presented to support that the Debtor had any knowledge it had been issued or that anyone was looking for him or the truck.

The Debtor testified that he sold the truck because it was in poor running condition and he lacked the necessary funds to fix and maintain it. He still maintained his ownership interest

---

[6]     *Complaint* ¶ 16.

9

in his residence and made no attempt to transfer it. Had the truck not been sold, it too, like the Debtor's residence would have been subject to exemption in its entirety in the pending bankruptcy case.

The totality of circumstances leads the Court to conclude that the Debtor did not transfer the truck with the intent to hinder, delay or defraud creditors. As a purely objective matter, there was ample reason why the Debtor would have wanted to sell the truck without a need to invoke the hypothesis that he was doing so to hinder creditors. The Debtor gave uncontradicted testimony that the truck could not be operated for more than 10 minutes before it would have to be stopped and water added to the radiator. Debtor also testified without dispute that he lacked the financial resources to fix the vehicles' problems. Given that reality, the truck was of very limited usefulness to the Debtor, which the Court finds is the most likely motivation for its sale. The mere existence of the judgment against the Debtor – at least in the absence of any evidence to show he had knowledge of Barry's active effort to enforce it – is insufficient to change that conclusion.

There was no evidence that the amount which the Debtor received for the truck ($1,250) was an inadequate consideration. Given that the truck was sold at a public auction, the Court therefore finds that the sale price itself was not out of line and does not raise any inference or suggestion of an intent to hinder, delay or defraud creditors.

After the auction sale, the Debtor had effectively converted a deficient 11 year old truck into an equivalent value of cash. What of his subsequent transfer of those funds to his wife? Although that is not raised in the *Complaint*, it was brought up by Plaintiffs at trial and alleged to provide evidence of an intent to hinder, delay and defraud. The Debtor did not object that this was

beyond the scope of the pleadings, and in the absence of such objection, the Court must treat this as an issue tried by consent. *See Fed.R.Bankr.P. 7015*, incorporating *Fed.R.Civ.P. 15(b)(2).*

The Court has considered this "second" transfer but finds that it does not advance the Plaintiffs' case. The Debtor and his wife, though separated at the time, retained many of the characteristics of an integrated family unit. The Debtor and his wife have four children together and the Debtor is a stepfather to wife's other child. Debtor testified at the §341 Meeting that it was his practice to voluntarily give his wife whatever money he earned for the support of her and the children and she would give him money back to live on. *See Amended Schedule J* filed at Document No. 24 following the §341 Meeting. The integral functioning of the Debtor and his wife and children during 2009, despite their physical separation, is further demonstrated by Debtor's testimony that he would occasionally stay at his wife's residence and relied on the use of her vehicle for transportation after the truck was sold. Indeed, it was his wife who followed the Debtor when he drove the truck to the auction house to be sold.

Under these circumstances, the Court views the payment of the sale proceeds to the Debtor's wife not as a transfer intended to delay, hinder or defraud creditors but rather as part of the Debtor's customary efforts to support his family with their ongoing living expenses.[7] A payment of $1,250 to his wife, who was then maintaining a separate residence with five minor children, was

---

[7] Under Pennsylvania law, a parent has an absolute duty to support one's children and such obligation is not dependent on a person having custody of the children. *J.F. v. D.B.*, 941 A.2d 718 (Pa. Super. Ct. 2008). Likewise, spouses owe each other a duty of support, even if they are separated, unless the separation is "willful and malicious and without consent or encouragement." *Morley v. Morley*, 424 A.2d 524, 526 (Pa. Super. Ct. 1981). The evidence in the present case showed that the separation between Debtor and his wife was consensual and, apparently, amicable. Thus, in making support payments to the wife for the benefit of her and the children, Debtor was fulfilling his legal, as well as moral, obligation.

certainly not extravagant or unreasonable. *See, e.g., In re Gugliada*, 20 B.R. 524 (Bankr. S.D. N.Y. 1982) (debtor's customary transfer of his paychecks to wife, with allowance back to him, for living expenses rebutted any prescription of actual fraud); *In re Birenbaum*, 2011 W.L. 1168167 (Bankr. N.D. Tex. 2011) (debtor's payments to wife during the 12 months preceding the bankruptcy filing were an allowance for his use and to pay expenses and did not support a *Section 727(c)(2)(A)* claim); *In re DiFabio*, 2004 W.L. 5250438 (Bankr. D. Conn. 2004) (where it was debtor's practice to turn over earnings to wife for household expenses, such conduct, without more, does not amount to evidence of a fraudulent intent to support a denial of discharge under Section 727(c)(2)(a)).

### *Section 727(a)(4)(A)*

*11 U.S.C. §727(a)(4)(A)* "is designed to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the estate without their having to conduct costly investigations to discover the debtor's true financial condition." *In re Singh*, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010).

Under *Section 727(a)(4)(A)* a court shall not grant a discharge to a debtor if the debtor "knowingly and fraudulently, in or in connection with a case made a false oath or account." *Id.* To deny a debtor a discharge under this provision the complaining party must prove by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Corona* at *7; *Cadle Co. v. Zofko*, 380 B.R. at 382. To support the denial of a discharge, the objecting party must prove an "actual intent

on the part of the bankrupt to hinder, delay or defraud his creditors." *In re Georges,* 138 Fed. Appx. at 472 *quoting In re Topper*, 229 F.2d 691, 692 (3d Cir. 1956). "The relevant fraudulent intent under *§ 727(a)(4)(A)* can be established by a showing of the debtor's 'reckless indifference to the truth,' which may include a pattern of nondisclosure." *Zofko* at 382-83 (citations omitted).

For purposes of *Section 727(a)(4)(A)*, a debtor's failure to list in the bankruptcy schedules and statement of financial affairs all assets owned can constitute a false oath or account since these statements are made under oath. *Zofko* at 384; *Singh* at 154. An honest mistake or oversight is not sufficient to deny a debtor his discharge. *Singh* at 154. Even a false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent" sufficient to deny a discharge. *In re Oliver*, 414 B.R. 361, 374 (Bankr. E.D. Tenn. 2009).

Plaintiffs base their *Complaint* for a denial of discharge under *Section 727(a)(4)(A)* on alleged omissions found in the Debtor's Statement of Financial Affairs, his answers to questions at the *Section 341 Meeting,* and his deposition testimony. The Trustee itemizes a number of "false" statements by the Debtor in his post-trial brief:

> (1) He answered "none" in response to Question 10 of the Statement of Financial Affairs which requires a Debtor to disclose all transfers of property made within the 2 years prior to the bankruptcy filing. This was a false statement.
>
> (2) When asked, "Are there any errors or omissions that require the court's attention at this time?" the Defendant answered "No". (*Exhibit F* at p. 79). This was a false statement.
>
> (3) When asked, "In the five years prior to your Bankruptcy filing, did you give away or transfer any of your property to anyone else?" the Defendant answered "No". (*Exhibit F* at p. 80). This was a false statement.

13

(4)  When asked, "Well, previously I asked you if you transferred any of your property, and you said no. So now you're telling me, yes, you did?" The Attorney for the Debtor ... then interjected, "You didn't actually transfer it to anybody, did you?" The Defendant responded, "No, no." (*Exhibit F* at p. 85). This was a false statement.

(5)  At the time of Mr. Ciotti's deposition, he stated that the truck could not be located by the Erie County Sheriff because he was "working with his truck." (*Exhibit G* at p. 103) but then stated that the truck "wasn't running" (*Exhibit F* at p. 84), but then states that he drove it to West Springfield to be sold at the auction. (*Exhibit G* at p. 104). One of the foregoing statements was a false statement. The truck was either running and he was using it for work or it didn't run.

(6)  Mr. Ciotti also attempted to deny the obvious and continued to provide false oaths throughout his deposition. The following is an example:

| | |
|---|---|
| Q. | Mr. Ciotti you just testified that you had never seen what's been marked as Defendant's Exhibit 1 before. |
| A. | No. |
| Q. | Did you prepare for today's deposition with your attorney? |
| A. | No. |
| Q. | You didn't meet with him prior to coming down here today to conduct this deposition? |
| A. | I came a little bit earlier but not about this. |
| Q. | So you didn't discuss today's deposition with your attorney at all today? |
| A. | No. No. |
| Q. | So he wouldn't have shown you what he anticipated asking you questions about today? |
| A. | No. |

*Trustee's Post-Trial Brief*, Doc. No. 56, at 7-9.

Initially, the Court finds it improper to characterize Items 2 and 5, listed above, as false statements for purposes of the *Section 727(a)(4)(A)* analysis. Item 2 concerns an answer given to a question at the §341 Meeting that was so broad and open-ended that it probably should have been objected to by Debtor's Counsel. If a similar blanket question was asked of the Debtor at trial, the Court would not hesitate to sustain an objection and direct the examiner to ask a more focused question. More to the point, however, it is inappropriate to make a finding that a false statement was

14

made regarding a particular matter on the basis of such a general and vague predicate. The §341 Meeting was conducted over a period of time during which the Trustee and Barry asked the Debtor many questions touching on a variety of different subject matters. As explained below, in regards to the specific instances of the allegedly false statements raised by the Plaintiffs, they were made as a result of mistake or misunderstanding on the Debtor's part not because of an intent to deceive. Under these circumstances, the Court will not treat Debtor's answer during the §341 Meeting to such a general, nonspecific question as a false statement supporting a finding of nondischargeability in this case.

Item 5 in the list is in keeping with the Plaintiffs' attempt to make too much of the Debtor's testimony concerning the condition of the truck prior to its sale. For instance, at the §341 Meeting, when asked about the truck, the Debtor testified that: "It broke down ... It wasn't running. I got rid of it." *Ex. F.* at 9. The Trustee points out that, by his own admission, the Debtor drove the truck to the auction. The Trustee contends that for the Debtor to then testify that it was not running amounts to a false statement. The Court views all of the allegedly false testimony related to the condition of the truck as a matter of semantics.

As indicated previously, the Debtor gave uncontradicted testimony that the truck could only be driven for about ten minutes before it had to be stopped so that water could be added to the radiator. That is certainly not a level of operation that would be acceptable to the average driver, so the Court can readily see how the Debtor may have answered the way he did without being motivated by any fraudulent intent. Thus, the Court does not view testimony that the truck "wasn't running" as false.

As to the remaining items in the list, the Court does not disagree with the Plaintiffs contention that the Debtor did make false statements and that those statements were made under oath. The Court does find, however, that the Debtor's statements were not made with any fraudulent intent, or even reckless indifference to the truth, but rather were the product of a mistake or misunderstanding by the Debtor. The Court finds credible the Debtor's testimony that he thought "transfer" meant the disposition of property for which reasonable value was not received, and, his testimony that he thought "property" meant "real property."

Items 1, 3 and 4 on the list all relate to the "transfer" of property and may be considered together. A review of the Debtor's testimony at the §341 Meeting is instructive on the point at issue. When first asked whether he had given away or transferred "any of your property to anyone else" in the five years prior to the bankruptcy filing, he answered "no," consistent with his answers to "Question 10" on the Statement of Financial Affairs. *See Ex. F,* at 5. However, when directly asked what had happened to his truck, he truthfully answered that he had sold it at an auction about three or six months earlier. *Id.* at 10. A few moments later, in responding to a question about how he cashed his paycheck from work, the Debtor spontaneously volunteered: "When you said property, I thought it was real estate." *Id.* at 11. This suggests an honest explanation for a previous answer rather than a calculated deception. *See, e.g., In re McGowan*, 18 B.R. 981 (Bankr. E.D. N.Y. 1982) (debtor's response of "no" to question at §341 Meeting as to whether he owned stocks, bonds or U.S. savings bonds in the preceding 3 years did not preclude discharge even though the debtor was the sole owner of a corporation where the debtor admitted ownership of the corporation in response to the very next question; in answering "no" the debtor did not intend to conceal his interest in the corporation); *In re Berry*, 1 B.R. 127 (Bankr. E.D. Tenn.

16

1979) (court would consider later disclosure at a meeting of creditors as evidence of a lack of fraudulent intent).

The Debtor continued to maintain that same position at trial. Having had the opportunity to observe the Debtor at trial, the Court found him to be somewhat unsophisticated as to financial matters. As the overarching reason for the Debtor to file his bankruptcy was to save his house, the Court finds it plausible that he understood property as being limited to real property.

Plaintiffs also point to the Debtor's testimony that he transferred the proceeds from the sale of the truck to his wife as support for his children. Plaintiffs assert that the Debtor should have listed this transfer as a "gift" in the Statement of Financial Affairs. The Court does not view payment of support as synonymous with the tendering of a "gift." It was noted previously that the Debtor was under a legal obligation to provide support for his wife and children. *See n. 7, supra*. Furthermore, the Debtor's testimony established that this payment was in keeping with his usual practice of transferring his earnings to his wife for the living expenses of her and the children. The Court finds it understandable that the Debtor would not have considered the support payment "a gift" and would thus not have had a reason to report it as such on the Statement of Financial Affairs. *See Oliver*, 414 B.R. at 375-76.

Item 4 on the Trustee's list of allegedly false statements requiring a finding of nondischargeability deserves an additional comment because it is somewhat taken out of context. The Court has carefully reviewed the transcript from the §341 Meeting and it is unclear whether in answering "no, no," the Debtor was responding to the interjected question from his own attorney (as Plaintiffs contend), or to the immediate preceding question from the Trustee. Furthermore, and

17

in any event, the very next question and answer at the §341 Meeting consisted of the following:

    Q.    Where's the truck?
    A.    That, I don't really know. I sold it at an auction.

That was a true statement and the Court finds that it dispels any doubt as to whether the previous answer was intentionally or recklessly false.

Finally, Item 6 on the list concerns false statements the Debtor made when questioned at his deposition about whether he had met with his attorney earlier in the day to review exhibits and his deposition testimony. Upon questioning by his attorney later in the deposition he promptly admitted that they had in fact met prior to the deposition commencement. The Court finds credible the Debtor's explanation of his mistaken belief at the time, i.e., that since communications between the Debtor and his attorney are generally considered confidential, he truly believed he was not supposed to reveal the pre-deposition review of testimony. Additionally, the deposition questions and answers which the Trustee has pointed to do not appear to meet the standard of materiality required to deny a discharge pursuant to *Section 727(a)(4)(A)* since they do not relate to the Debtor's business transactions or estate and do not concern the discovery of business dealings, assets or the existence and disposition of Debtor's property. *Zofko* at 383.

## *CONCLUSION*

The Debtor made honest mistakes in his schedules and in his statements at the meeting of creditors and during the course of this Adversary Proceeding. The mistakes were promptly corrected and the truth made clear. The Court finds the Debtor's explanations for the

"misstatements" to be credible especially in light of his level of sophistication and understanding of the questions presented to him. After witnessing his demeanor and candor during his testimony, it is clear to the Court that no fraudulent intent existed in the Debtor by his "misstatements" and that the Debtor did not exhibit a reckless indifference to the truth when making these statements. The Plaintiffs have failed to meet their burden of proving the elements necessary for denial of the Debtor's discharge under either *Section 727(a)(2)(A)* or *Section 727(a)(4)(A)* by a preponderance of the evidence. Therefore, the *Complaint* will be dismissed by separate Order.

Dated: April 18, 2011

                                          Thomas P. Agresti, Chief Judge
                                          United States Bankruptcy Court

Case Administrator to serve:
       John C. Melarango, Esq.
       Jay R. Stranahan, Esq.
       Boubacar Barry
       Debtor

19

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| CARMEN V. CIOTTI, | : | Case No. 09-11786-TPA |
| *Debtor* | : | Chapter 7 |
| | | |
| JOHN C. MELARANGO, | : | Adversary No. 09-1152-TPA |
| TRUSTEE AND BOUBACAR | : | Document No. 15 |
| BARRY, | : | |
| *Plaintiffs* | : | |
| v. | : | |
| | : | |
| CARMEN V. CIOTTI | : | |
| *Defendant* | : | |

### **ORDER**

*AND NOW*, this **18th** day of ***April, 2011***, based upon the findings or fact and conclusions of law issued pursuant to *Fed.R.Bankr.P. 7052* as set forth in the *Memorandum Opinion* filed this date, it is hereby ***ORDERED, ADJUDGED and DECREED*** that the ***Amended Complaint to Determine the Dischargeability of a Debt***, filed by Plaintiffs John C. Melarango, Trustee and Boubacar Barry at Document No. 15, is ***DISMISSED***, with prejudice.

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    John C. Melarango, Esq.
    Jay R. Stranahan, Esq.
    Boubacar Barry
    Debtor